We'll hear argument this morning in Case 11-182, Arizona v. the United States. Mr. Clement. Mr. Chief Justice, and may it please the Court, the State of Arizona bears a disproportionate share of the costs of illegal immigration. In addressing those costs, Arizona borrowed the federal standards as its own and attempted to enlist state resources in the enforcement of the uniform federal immigration laws. Notwithstanding that, the United States took the extraordinary step of seeking a preliminary injunction to enjoin the statute as impliedly preempted on its face before it took effect. The Ninth Circuit agreed with respect to four provisions, but only by inverting fundamental principles of federalism. The Ninth Circuit essentially demanded that Arizona point to specific authorization in federal statute for its approach, but that gets matters backwards. A state does not need to point to federal authorization for its enforcement efforts. Rather, the burden is on the party seeking to preempt a duly enacted state law to point to some provision in statutory law that does the preempting. Now, the United States can't really do that here, and the reason is obvious. There are multiple provisions of the federal immigration law that go out of their way to try to facilitate state and local efforts to communicate with federal immigration officials in order to ascertain the immigration status of individuals. So for example, 1373C specifically requires that federal immigration officials shall respond to inquiries from state and local officials about somebody's immigration status. 1373A goes even further. That provision says that no federal agency or officer may prohibit or in any way restrict the ability of state and local officers to communicate with federal immigration officers to ascertain somebody's immigration status. Indeed, if the DHS... Could I interrupt, and turning to 2B, could you tell me what the state's view is? The government proposes that it should be read on its face one way, and I think the state is arguing that there's a narrower way to read it, but am I to understand that under the state's position in this action, the only time that the inquiry about the status of an individual rises is after they've had probable cause to arrest that individual for some other crime? That's exactly right, Justice Sotomayor. So this only operates when somebody's been essentially stopped for some other infraction, and then at that point, if there's reasonable suspicion to try to identify immigration status, then that can happen. Of course, one of the things that... Can I just stop you there just one moment? That's what I thought. So presumably, I think your argument is that under any circumstance, a police officer would have the discretion to make that call. Seems to me that the issue is not about whether you make the call or not, although the government is arguing that it might be, but on how long you detain the individual. Meaning, as I understand it, when individuals are arrested and held for other crimes, often there's an immigration check that most states do without this law. And to the extent that the government wants to remove that individual, they put in a warrant of detainment. This process is different. How is it different? Well, it's different in one important respect, Justice Sotomayor, and that's why I don't think that the issue that divides the parties is only the issue of how long you can detain somebody, because I think the federal government takes the rather unusual position that even though these stops and these inquiries, if done on an ad hoc basis, become preempted if they're done on a systematic basis. No, I understand that's their argument. I can question them about that. Okay, but... So I want to get to how assuming your position that doing it on a systematic, there's nothing wrong with doing it as it's been done in the past, whenever anyone is detained, a call could be made. What I see as critical is the issue of how long and when is the officer going to exercise discretion to release the person? And with respect, I don't think Section 2B really speaks to that, which is to say I don't think Section 2B says that the systematic inquiry has to take any longer than the ad hoc inquiry. And indeed, Section 2 in one of its provisions specifically says that it has to be implemented in a way that's consistent with federal, both immigration law and civil rights law. So there... What happens if this is the following call? The call to the federal government? Yes, he's an illegal alien. No, we don't want to detain him. What does the law say, the Arizona law say with respect to releasing that individual? Well, I don't know that it speaks to it in specific terms, but here's what I believe would happen, which is to say at that point, then the officer would ask themselves whether there's any reason to continue to detain the person for state law purposes. I mean, it could be that the original offense that the person was pulled over needs to be dealt with or something like that. I'm putting all of this outside of... But if what we're talking about is simply what happens then for purposes of the federal immigration consequences, the answer is nothing. The individual at that point is released. And that I think can be very well illustrated by Section 6. I don't want to change the subject unnecessarily, but there's an arrest authority for somebody who's committed a public offense, which means that it's a crime in another state and in Arizona, but the person can't be arrested for that offense, presumably because they've already served their sentence for the offense. And then there's new arrest authority given to the officer to hold that person if they are deportable for that offense. Now, I think in that circumstance, it's very clear what would happen is an inquiry would be made to the federal officials that would say, do you want us to transfer this person to your custody or hold this person until you can take custody? And if the answer is no, then that's the end of it. That individual is released because there's no independent basis in that situation for the state officer to continue to detain the individual at all. But how would the state officer know if the person is removable? I mean, that's sometimes a complex inquiry. Well, Justice Ginsburg, I think there's two answers to that. One is you're right. Sometimes it's a complex inquiry. Sometimes it's a straightforward inquiry. It could be murder. It could be a drug crime. But I think the practical answer to the question is, by hypothesis, there's going to be an inquiry made to the federal immigration authorities, either the law enforcement support center or a 287G officer. And presumably, as part of that inquiry, they can figure out whether or not this is a removable offense or at least a substantially likely removable offense. It takes two weeks to make that determination. Could the alien be held by the state for that whole period of time just under Section 6? I don't think so, Your Honor. And I think that in all of these provisions, you have the Fourth Amendment backing up the limits. And I think so. What would be the standard? You're the attorney for the alien. They're going to hold him for two weeks until they figure out whether this is a removable offense. And you say under the Fourth Amendment, you cannot hold for, what, more than a reasonable time? Yeah, ultimately, it's a reasonable inquiry. And I think that under these circumstances, what we know from the record here is that generally the immigration status inquiry is something that takes 10 or 11 minutes. I mean, it's not we're not talking about something or no more than 10 if it's a 28 7G officer and roughly 11 minutes on average if it's the law enforcement support center. How do they have? Well, I have the same question, but I'm trying to think of examples. Example one is the person is arrested. Now, it says any person who's arrested shall have the person's immigration status determined before the person is released. So I wonder if they've arrested a citizen. He's Hispanic looking. He was jogging. He has a backpack. He has water in it and Pedialyte. So they think, oh, maybe this is an illegal person. It happens he's a citizen of New Mexico. And so the driver's license doesn't work. And now they put him in jail. And are you can you represent to us? I don't know if you can or not. Can you represent to us? He will not stay in jail. In detention for a significantly longer period of time than he would have stayed in the absence of section to be. You want to represent that or not? I don't want to represent that right now. If you cannot represent that and I'm not surprised you don't want to. I mean, I don't know. Sure. Sure. But what I can represent is that he's not going to be detained any longer than the Fourth Amendment allows. Oh, fine. And for the Fourth Amendment, since for I mean, that's that's another question. I don't know how long the Fourth Amendment allows. I don't know on that. There probably is a range of things. But we do know that a person ordinarily for this crime X would have been released after a day. Oh, you know, the Fourth Amendment would have allowed more. So now what I want to know is what in practice will happen from your representation. I think that there will be a significant number of people, some of whom won't be arrested. It takes 11 minutes for some for citizens. It might take two hours. It might take two days. OK, there will be a significant number of people who will be detained at the stop or in prison for a significantly longer period of time than in the absence of to be. Is that a fair conclusion? I don't think it is, Justice Breyer. And here's why it's not, because even though there certainly are situations where state authorities will arrest somebody and then release them relatively rapidly, they generally don't release somebody until they can nail down their identity and whether or not they are likely to come to a court hearing at a subsequent. It's anyway, if this is a problem, is it an immigration law problem or is it a Fourth Amendment problem? Justice Scalia, it is not government's attack on this that it violates the Fourth Amendment. No, of course, the federal government that also has a lot of immigration arrests that are subject to the Fourth Amendment is not making a Fourth Amendment claim here. And it's neither an immigration law concern or something that should be the basis for striking down a statute on its face. That's a different argument. They do want to be responsive and make the point that I think the factual premise that this is going to be is going to lead to the elongation of a lot of arrests is not. Can I make the following statement in the opinion? And you will say that's OK. Imagine, imagine we interpret or imagine we interpret Section 2B as not authorizing or requiring the detention of any individual under 2B, either at the stop or in prison, for a significantly longer period of time than that person would have been detained in the absence of 2B. Can I make that statement in an opinion? You'll say that's right. I think what you could say. Can I say that? I don't think you could say just that. I think you can say something similar, though. I think you probably could say, look, this is a facial challenge. The statute's never gone into effect. We don't anticipate that Section 2B would elongate in a significant number of cases the detention or the arrests. I think you could say that. And the reason is, as I indicated, it's something that happens even without this law, that when you arrest somebody, and there are some offenses that you can arrest and release under State law, but before you release the individual, you generally want to ascertain that that individual is going to show up at the hearing. And that's what really distinguishes those cases where there's arrest and release from those cases where there's arrest and you book somebody. Now, here's the other reason why I don't think factually this is going to elongate things, because already in a significant number of booking facilities in Arizona, you already have the process that people are systematically run through immigration checks when they are booked as part of the booking process. That's reflected in the record here in the Maricopa County system, that that's done by a 287G officer as a matter of routine. The federal government doesn't like this statute, but they're very proud of their Secured Communities Program. And their Secured Communities Program also makes clear that everybody that's booked at participating facilities is eventually has their immigration status checked. And so I don't think that this immigration status check is likely to lead to a substantial elongation of the stops or the detentions. Now, obviously- I want to make sure that I get a clear representation from you. If at a call to the federal agency, the agency says, we don't want to detain this alien, that alien will be released for, unless it's under six is what you're telling me, or under six, three, or one other of Arizona's immigration crimes. Exactly. Obviously, if this is somebody who is going, you know, 60 miles an hour in a 20-mile-an-hour school zone or something, they may decide, wholly apart from the immigration issue, that this is somebody they want to bring back to the station. But for purposes of-once they make the contact with federal immigration officials, if the federal immigration officials say, look, we have no interest in removing this person, we have no interest in prosecuting this person under the federal criminal provisions, then that's the end of the federal piece of the- And so you concede that the state has to accept within its borders all people who have no right to be there, that the federal government has no interest in removing? No, I don't accept that, Judge Scalia, but that- That's all the statute. And you call up the federal government, the federal government, yeah, we-he's an illegal immigrant, but that's okay with us. And the state has no power to close its borders to people who have no right to be there? Well, Justice Scalia, here's my response, which is all of this discussion, at least as I've understood it, has been about 2B and to a lesser extent 6. Now, Section 3 of the statute does provide an authority under state law to penalize somebody who is violated essentially the federal registration requirements. So if that's-as to that provision, there would be a state authority, even under these hypotheticals, to take action with respect to the individual, but not with respect to the federal- But I think Justice Scalia's question was the broader one, just as a theoretical matter. Can we say, or do you take the position, that a state must accept within its borders a person who is illegally present under federal law? Well, and I think- And that is by reason of his alienation, is it? And I think my answer to that is no. I think the reason my answer is no has more to do with our defense of Section 3 and other provisions than it does with respect to the inquiry and arrest authority provisions 2B and 6. Before you move on to the registration requirement, could I take you back to an example that's similar to the one that Justice Breyer was referring to? Let someone-let's say someone who is a citizen and a resident of New Mexico, has a New Mexico driver's license, drives across the border, is stopped for speeding not 60 miles an hour in a 20-mile zone, but 10 miles over the speed limit on an interstate. And the officer, for some reason, thinks that this person may be an illegal alien. How would that work out? If you do the records check, you're not going to get anything back, right? Because the person is a citizen. So where would the officer take it from there? Well, if I could just kind of work back for a second. I mean, obviously, it's a pretty unusual circumstance where somebody produces an out-of-state driver's license and that doesn't dispel reasonable suspicion for the officer. But I'll take the hypothesis- Why would it dispel reasonable suspicion if it's-if the officer knows it's a state that issues driver's licenses to aliens who are not lawfully in- Well, and that might be a situation where that's the case and then it wouldn't dispel the reasonable suspicion. But I'm saying, in the average case, I think it would. So, they would then go further and then they would then make the inquiry to the federal officials. And then, if because of the fact that the individual actually is a citizen or something like that, then what would happen is, at some point, you'd get to the end of a permissible tariff stop and the officer would release the individual. Now, it might not be the end of the matter, because, of course, they still have the name, they still have the ability to collect that information and try to continue the check as they move forward, taking down the information on the New Mexico driver's license. But I think the important thing is that, you know, this statute doesn't authorize them to detain the individual, certainly beyond the Fourth Amendment limits, and it really doesn't authorize them to do anything that the official couldn't do on an ad hoc basis without the statute. Now, it doesn't- That may be the case, and I would like to ask General Verrilli about that. But under the Fourth Amendment, presumably, if the officer can arrest, if the state officer can arrest a person simply on the ground that the person is removable, which is what the Office of Legal Counsel opined some years ago, then presumably the officer could continue to detain that individual that I mentioned until they reach the point where the tariff stop becomes an arrest, at which time they would have to have probable cause. But if they had probable cause to believe the person was removable, then they could hold the person, presumably, until the person's status was completely verified. Isn't that correct? I think that's correct, Your Honor. Now, as we read Section 6, because there's a preexisting definition of public offense in Arizona law, we don't think this is kind of the full Office of Legal Counsel situation where you have broad arrest authority for removable individuals. This is a relatively narrow slice of additional arrest authority that happens to give arrest authority for people that seem to fit the federal government's priority, because it really is going to apply to criminal aliens. But I don't take any issue with what you're saying. I do think, though, it's important to understand that 2B really doesn't give the officer an authority he didn't otherwise have. It does do one thing that's very important, though, which it does have the effect of overriding local policies that actually forbade some officers from making those communications. And because that's one of the primary effects of 2B, it just shows how difficult the government's preemption argument is here, because those kind of local policies are expressly forbidden by federal statute. 1373A and 8 U.S.C. 1644 basically say that localities can't have those kind of sanctuary laws. And so one effect that 2B has is, on a state level, it basically says, look, you can't have local officers telling you not to make those inquiries. You must have those inquiries. Counsel, does Section 6 permit an officer to arrest an individual who has overstayed a visitor's visa by a day? They're removable, correct? They are removable. I don't think they would have committed a public offense, as in a very unusual situation. I don't think they would have committed a public offense under Arizona law. So I don't think there actually would be arrest authority in that circumstance, as Justice Alito's question has said. What is the definition of public offense? A public offense definition, it's actually, it's a petition appendix. Well, I'm sorry, the definition is basically that it's something that is a crime in another jurisdiction and also a crime in Arizona. And so what makes this kind of anomalous is normally, if something is a crime in Arizona, there's arrest authority for that directly. So what this really captures is people who have committed a crime are no longer arrestable for the crime because they've served their sentence or some other peculiarity. But they're nonetheless removable because of the crime. Counsel, maybe it's a good time to talk about some of the other sections. In particular, Section 5C. Now that does seem to expand beyond the federal government's determination about the types of sanctions that should govern the employment relationship. You talk about supply and demand. The federal government, of course, prohibits the employment. But it also imposes sanctions with respect to application for work. And the state of Arizona, in this case, is imposing some significantly greater sanctions. Well, it's certainly imposing different sanctions. I mean, you know, it's a little bit kind of hard to weigh the difference between removability, which is obviously a pretty significant sanction for an alien, and the relatively modest penalties imposed by Section 5C. But I take the premise that 5C does something that there's no direct analog in federal law. But that's not enough to get you to preemption, obviously. And one of the things that makes 5C, it seems to us, a weak case for preemption, is that it only targets employment that is expressly forbidden by federal law. And so then we look at, you know, essentially the government is reduced to arguing that because in 1986, when Congress passed IRCA, it only focused on the employer side of the equation and didn't, generally speaking, impose restrictions on employees, that somehow they're going to draw a preemptive inference from that. Counsel. Would you agree that, would you accept, as a working hypothesis, that we can begin with the general principle that the Hines versus Davidovich language controls here, and we're going to ask our principle, our primary function is to determine whether in the circumstances of this particular case, Arizona's law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress? Is that an acceptable test from your standpoint? I think it's an acceptable test. I mean, Justice Kennedy, you know, there obviously have been subsequent cases, including DeConnett's and Whiting, that give additional shape and color to that test. And, but I don't have any, I don't have any real quarrel with that test. And here's why I don't think that you can. But then the government on this section is going to come and say, well, there may be, this must be, the enforcement of this statute, as Arizona describes it, will be in considerable tension with our basic approach. Isn't that what I'm going to hear from the government? It may be what you're going to hear, Justice Kennedy, but I don't think you just take the federal government for its word on these things. You know, it's interesting. In DeConnett's itself, the SG said that that California statute was preempted. And in DeConnett's, this court didn't say, well, you know, we got this language from Hines and we have the SG telling us it's preempted, that's good enough for us. They went beyond that and they looked hard. And what they did is they established that this is an area where the presumption against preemption applies. So that seems one strike in our favor. We have here a situation where there is an express preemption provision and it only addresses the employer's side of the ledger. So the express preemption provision clearly doesn't apply here. So the only thing they have is the interest. Well, for those of us for whom legislative history has some importance, there seems to be quite a bit of legislative history that the idea of punishing employees was raised, discussed, and explicitly rejected. Sure. I mean, the preemption language would be geared to what was decided to be punished. It seems odd to think that the federal government is deciding on employment sanctions and has unconsciously decided not to punish employees. But Justice Sotomayor, there's a big difference between Congress deciding not as a matter of federal law to address employees with an additional criminal prohibition and saying that that decision itself has preempted effect. That's a rather remarkable additional step. And here's why I think if you consider the legislative history, for those who do, it really supports us because here's what Congress confronted. I mean, they started thinking about this problem in 1971. They passed IRCA in 1986. At that point, here's the state of the world. It's already unlawful as a matter of federal law for the employee to have this unlawful work. And if they seek this unlawful work, they are subject to removal for doing it. In addition, Congress was told that most of the aliens who get this unlawful work are already here. They've illegally entered. So they're already subject to an independent criminal offense. So at that point, Congress is facing a world where the employee is already subject to multiple prohibitions. The employer is completely scot-free as a matter of federal law. And so at that point, 1986, they address the employer side of the equation. They have an express preemption provision that says nothing about any intent of preempting the employee side of the ledger. And in that, I don't think they did provide. I mean, your position was the federal legislation regulates the supply side. That leaves the demand side open. But there is regulation. And the question is whether anything beyond that is inconsistent with the federal. It's not just that the person is removable. But if they use false documents in seeking work, that's a federal crime. So we have the, what you call, the supply side is regulated. But you want to regulate it more. Two quick responses. And I'd like to save time for rebuttal, Justice Ginsburg. The first is that if you look at what they regulate on the employee side, it's really things that actually assist in regulating the employer side. Because what they're worried about is a fraudulent document that then is used essentially to trick the employer to employing somebody who shouldn't be employed. The second thing is the more that you view IRCA as actually regulating part of the employee side, then I think the more persuasive it is that the express preemption provision doesn't reach the employee side of the equation. We'll give you plenty of rebuttal time, but I'd like to hear what you have to say about Section 3 before you sit down. Thank you, Mr. Chief Justice. I appreciate the opportunity to do that. I do think as to Section 3, the question is really, it's a provision that is parallel to the federal requirements and imposes the same punishments as the federal requirements. So it's generally not a fertile ground for preemption. But of course, there are cases that find preemption even in those analogous circumstances. They're the cases that the government is forced to rely on. Cases like Buckman. Would double prosecutions be as opposed to aiding or prosecuted under a federal law for violating basically the terms of 3, could the states then prosecute him as well? I think they could under general double jeopardy principles and the dual sovereignty doctrine. Obviously, if that was a particular concern to you, that might be the basis for an as-applied challenge if somebody was already prosecuted under federal law. But of course, this Court has confronted exactly that argument in California against Zook where you had the statute of California that prohibited somebody operating as an interstate carrier without the ICC license. It was raised. You know, you have to let just the feds enforce that law. Otherwise, there's the possibility of duplicative punishment, duplicative prosecution. And this Court rejected that argument there. It seems that the, and I would think the largest hurdle for you is Hines, which says the registration scheme, Congress enacted a complete registration scheme which the states cannot complement or impose even auxiliary regulations. So I don't see the alien registration as a question of obstacle preemption, but of field preemption that alien, we don't want a competing registration scheme. We want the registration scheme to be wholly federal. Well, Justice Ginsburg, I think that's part of the reason why I accepted Justice Kennedy's characterization of the relevant language in Hines. Because although there's some general discussion there of field preemption, when the Court actually states what its holding is, it does state it in terms of obstacle preemption, and here's where I think there's a critical difference between what the Court had before it in Hines and what you have before you here. In Hines, Pennsylvania passed its statute before Congress passed the alien registration statute. So not surprisingly, you know, they weren't soothsayers in Pennsylvania. They couldn't predict the future. So when it got up here, there was a conflict between the provisions of the Pennsylvania registration law and the federal registration law, and this Court struck it down on that preemption basis. Here, it's quite different. Arizona had before it the federal statute. It looked at the precise provisions in the federal statute. It adopted those standards as its own, and then it imposed parallel penalties for violation of the state equivalent. And so I think the right analysis is really the analysis that this Court laid out in its Whiting decision, which says that in these kind of cases, what you look for is whether or not the state scheme directly interferes with the operation of the federal. May I ask you? Well, in that regard, we are told that there are some important categories of aliens who can't obtain registration, cannot obtain federal registration, and yet there are people that nobody would think should be removed. I think someone with a pending asylum application would fall into that category. How would Section 3 apply there? I think it probably wouldn't apply. There's two provisions that might make it inapplicable. The first question you'd ask is whether that individual in that category would be subject to prosecution under 1304 and 1306. And if I understand, you know, the government's position, there are certain people where, you know, they can't really get a registration document because of the narrow class that they're in.  So you're not liable for the willful failure to get a registration document. And when you don't have a registration document to carry, you don't run afoul of 1306. Well, of course, if you've entered the country illegally, you can't get a registration. Well, sure. But that's not the narrow class we were talking about. No, I understand, but I don't understand the distinction you were drawing, that you can't be prosecuted for lack of a registration if you couldn't have gotten a registration. Well, if you're in the country lawfully, I mean, you can try to register. And so somebody who enters illegally, I mean, they're already guilty of one federal misdemeanor by the illegal entry. But at the point that they stay 30 days and don't try to register, then that's an independent violation. So maybe I need to fix what I said and say, look, if you're somebody who, if you did go to register, would be told, you're fine, but we can't give you a registration document, then that individual is not subject to prosecution under the federal statute, therefore wouldn't be subject to prosecution under the state statute. Thank you, Mr. Clement. General Verrilli. Mr. Chief Justice, and may it please the Court. Before you get into what the case is about, I'd like to clear up at the outset what it's not about. No part of your argument has to do with racial or ethnic profiling, does it? I saw none of that in your brief. That's correct. Okay. So this is not a case about ethnic profiling. We're not making any allegation about racial or ethnic profiling in the case. Mr. Clement is working hard this morning to portray SB 1070 as an aid to federal immigration enforcement. But the very first provision of the statute declares that Arizona is pursuing its own policy of attrition through enforcement, and that the provisions of this law are designed to work together to drive unlawfully present aliens out of the state. That is something Arizona cannot do, because the Constitution vests exclusive... General, could you answer Justice Scalia's earlier question to your adversary? He asked whether it would be the government's position that Arizona doesn't have the power to exclude or remove, to exclude from its borders, a person who's here illegally. That is our position, Your Honor. It is our position because the Constitution vests exclusive authority over immigration matters with the national government. Well, all that means, it gives authority over naturalization, which we've expanded to immigration. But all that means is that the government can set forth the rules concerning who belongs in this country. But if, in fact, somebody who does not belong in this country is in Arizona, Arizona has no power? What does sovereignty mean if it does not include the ability to defend your borders? Your Honor, the framers vested in the national government the authority over immigration because they understood that the way this nation treats citizens of other countries is a vital aspect of our foreign relations. The national government and not an individual state. But it's still up to the national government. Arizona is not trying to kick out anybody that the federal government has not already said do not belong here. And the Constitution provides even with respect to the Commerce Clause, no state shall without the consent of Congress lay any imposts or duties on imports or exports except, it says, what may be absolutely necessary for executing its inspection laws. The Constitution recognizes that there is such a thing as state borders and the states can police their borders even to the point of inspecting incoming shipments to exclude the diseased material. But they cannot do what Arizona is seeking to do here, Your Honor, which is to elevate one consideration above all others. Arizona is pursuing a policy that maximizes the apprehension of unlawfully present aliens so they can be jailed as criminals in Arizona unless the federal government agrees to direct its enforcement resources to remove the people that Arizona has. That's a question of enforcement priorities. Well, let's say that the government had a different set of enforcement priorities and their objective was to protect to the maximum extent possible the borders and so anyone who is here illegally, they want to know about and they want to do something about. In other words, different than the current policy. Does that mean in that situation, the Arizona law would not be preempted? I think the mandatory character of the Arizona law and the mandatory character of the obligations it imposes, especially as backed by this extraordinary provision in Section 2H, which imposes civil penalties of up to $5,000 a day on any official in the state of Arizona who is not following Section 2 or, as we read it, the rest of SB 1070 to the maximum extent possible, does create a conflict. But I do think the most fundamental point about Section 2 is to understand its relationship to the other provisions in the statute. Section 2 is in the statute to identify the class of people who Arizona is then committed to prosecute under Section 3 and if they are employed also under Section 5. I have the same question as the Chief Justice. Suppose that the federal government changed its priorities tomorrow and it said, throughout the ones they have now, and they said the new policy is maximum enforcement. We want to know about every person who's stopped or arrested. We want to let their immigration status verified. Would the Arizona law then be unpreempted? No, I think it's still a problem, Your Honor. These decisions have to be made at the national level because it's the national government and not, it's the whole country and not an individual state. Do you have any example where enforcement discretion has the effect of preempting state action? Well, I think we should think about Section 3 of the law, Your Honor. I think it will help those. I'm putting another case of ours where we've said that essentially the preemption of state law can occur not by virtue of the Congress's preempting, but because the executive doesn't want this law enforced so rigorously. And that preempts the state from enforcing it rigorously. Do we have any cases that says that? I think the preemption here, focus for a moment on Section 3, the preemption here flows from judgments of Congress, from the registration system that Congress set up in Sections 1301 through 1306, from the decision of Congress in Section 1103 in the law to vest the Secretary of DHS and the Attorney General  Well, they do that with all federal criminal statutes. And you acknowledge that as a general matter, states can enforce federal criminal law, which is always entrusted to the Attorney General. They can engage in detention in support of the enforcement of federal law. That's what the OLC opinion from 2002 says. It does not say that they can prosecute under federal law, make their own decisions. That's a far different matter and really goes to the heart, I think, of what's wrong with Section 3 of this Act. Well, but you say that the federal government has to have control over who to prosecute. But I don't see how Section 2B says anything about that at all. All it does is notify the federal government, here's someone who is here illegally. Here's someone who is removable. The discretion to prosecute for federal immigration offenses rests entirely with the Attorney General. That's correct. But with respect to this, and let me address something fundamental about Section 2. That is true, but I think it doesn't get at the heart of the problem here. Section 1 of this statute says that Sections 2 and 3 and 5 are supposed to work together to achieve this policy of attrition through enforcement. And so what Section 2 does is identify a population that the state of Arizona is going to prosecute under Section 3 and Section 5. So if, apart from Section 3 and Section 5, take those off the table. You have no objection to Section 2. We do, Your Honor. But before I take 3 and 5 off the table, if I could make one more point about 3 and 5, please. I think it's important to understand the dilemma that this puts the federal government in. Arizona has got this population, and they're, by law, committed to maximum enforcement. And so the federal government's got to decide, are we going to take our resources, which we deploy for removal, and are we going to use them to deal with this population, even if it is to the detriment of their priorities? The federal government has to decide where it's going to use its resources. And what the state is saying, here are people who are here in violation of federal law. You make the decision. And if your decision is you don't want to prosecute those people, fine. That's entirely up to you. That's why I don't see the problem with Section 2B. Here's the other half of the equation, Mr. Chief Justice, which is that they say, if you're not going to remove them, we are going to prosecute them. And that means that the, and I think this does get at the heart of why this needs to be an exclusive national power. Only under Section 3 and Section 5. Yes, but what you're talking about is taking somebody whose only offense is being unlawfully present in the country and putting them in jail for up to six months. Let's say, for the notification, what could possibly be wrong if Arizona arrests someone, let's say for drunk driving, and their policy is you're going to stay in jail overnight no matter what? What's wrong during that period by having the Arizona arresting officer say, I'm going to call the federal agency and find out if this person is here illegally? Because the federal law says the federal agency has to answer my question. It seems an odd argument to say the federal agency has to answer the state's question, but the state can't ask it. Well, we're not saying the state can't ask it in any individual case. We recognize that Section 13 says that. You think there are individual cases in which the state can call the federal government and say, is this person here illegally? Yes, certainly, but that doesn't make sense. So doesn't that defeat the facial challenge to the act? I don't think so, Mr. Chief Justice, because I think the problem here is in that is in every circumstance, as a result of Section 2B of the law, backed by the penalties of Section 2H, the state official must pursue the priorities that the state has set, irrespective of whether they are helpful to or in conflict with the federal priorities. Suppose that every law enforcement officer in Arizona saw things exactly the same way as the Arizona legislature, and so without any direction from the legislature, they all took it upon themselves to make these inquiries every time they stopped somebody or arrested somebody. Would that be a violation of federal law? No, it wouldn't be, Your Honor, because in that situation, they would be free to be responsive to federal priorities if the federal officials came back to them and said, look, we need to focus on gangs. We need to focus on this drug problem at the border. But what if they said, well, we don't care what your priorities are. We have our priorities, and our priority is maximum enforcement, and we're going to call you in every case. Well, it was all done on an individual basis. All the officers were individually doing it. That would be OK. If there's a state policy locked in the law by statute, locked into law by regulation, then we have a problem. If the line is mandatory, that's what I can't understand, because your argument, you seem to be saying that what's wrong with the Arizona law is that the Arizona legislature is trying to control what its employees are doing. And they have to be free to disregard the desires of the Arizona legislature, for whom they work, and follow the priorities of the federal government, for whom they don't. But with respect to immigration enforcement, to the extent all they're doing is bringing people to the federal government's attention, they are cooperating in the enforcement of federal law. But the hypothetical is that that's all the legislature is doing. Well, except I think, Justice Kennedy, the problem is that it's not cooperation if, in every instance, the officers in the state must respond to the priorities set by the state government, and are not free to respond to the priorities of the federal officials who are trying to enforce the law in the most effective manner possible. General, I'm terribly confused by your answer, OK? And I don't know that you're focusing in on what I believe my colleagues are trying to get to. Making the... To be has two components, as I see it. Every person that's suspected of being an alien who's arrested for another crime, that's what Mr. Clement says the statute means, the officer has to pick up the phone and call the agency to find out if it's an illegal alien or not. He tells me that unless there's another reason to arrest the person, and that's three and six or any of the other provisions, but putting those aside, we're going to stay just in 2B, if the government says we don't want to detain the person, they have to be released for being simply an illegal alien. What's wrong with that? Taking out the other provisions. Taking out any independent state-created basis of liability for being an illegal alien. I think there are three. The first is the Heinz problem of harassment. Now, we are not making an allegation of racial profiling. Nevertheless, there are already tens of thousands of stops that result in inquiries in Arizona, even in the absence of SB 1070. It stands to reason that the legislature thought that that wasn't sufficient and there needed to be more. And given that you have a population in Arizona of 2 million Latinos, of whom only 400,000 at most are there unlawfully. It's like racial profiling to me. And given that what we are talking about is the status of being unlawfully present. Do you have the statistics as to how many arrests there are and what the percentage of calls before? There's some evidence in the record, Your Honor. It's the Palmatier Declaration, which is in the Joint Appendix. He was the fellow who used to run the Law Enforcement Support Center, which answers the inquiries. That declaration indicates that in fiscal year 2009, there were 80,000 inquiries. What does this have to do with federal immigration law? I mean, it may have to do with racial harassment, but I thought you weren't relying on that. Are you objecting to harassing the people who have no business being here? Is that... Surely you're not concerned about harassing them. They've been stopped anyway, and all you're doing is calling up to see if they're illegal immigrants or not. So you must be talking about other people who have nothing to do with our immigration laws, OK? Citizens and other people, right? And other people lawfully present in the country, certainly. But this has nothing to do with the immigration law, which is what you're asserting preempts all of this activity. Hines identified this prominence harassment as a central feature of preemption under the immigration laws because of the concern that the way this nation treats citizens of other countries is fundamental to our foreign relations. And this is a... Let me just go back, because I think... ..if we get focused, the question I think others are asking, and one way to focus it is the same question I asked Mr Clementi. Think of to be the first sentence, right? Now, I can think... I'm not saying they're right. But if that means you're going to hold an individual longer than you would have otherwise, I can think of some arguments that it is preemptive, and some replies, so keep that out of it. Suppose that we were to say, that sentence, as we understand it, does not raise a constitutional problem as long as it is interpreted to mean that the policeman, irrespective of what answer he gets from ICE, cannot detain the person for longer than he would have done in the absence of this provision. Now, in your view, is there any preemption exemption... ..argument against? Any preemption argument against that sentence as I have just interpreted? I don't know what your answer is, and that's why I'm asking. We think it would ameliorate the practical problem, but there's still a structural problem here, in that this is an effort to enforce federal law, and under the Constitution, it's the president and the executive branch that are responsible for the enforcement of federal law. It is not an effort to enforce federal law. It is an effort to let you know about violations of federal law. Whether or not to enforce them is still entirely up to you. If you don't want to do this, you just tell the person at LESC, if that's the right... Is that the right acronym, LESC? Look, when somebody from Arizona calls, answer their question and don't even bother to write it down. OK, I stopped somebody else. Is he legal or illegal? Let me check. Oh, he's illegal. OK, thanks. Goodbye. Why? It is still your decision, and if you don't want to know who is in this country illegally, you don't have to. That's correct, but the process of cooperating to enforce the federal immigration law starts earlier, and it starts with the process of making the decisions about who to stop, who to apprehend, who to check on, and the structural problem we have is that those decisions, in the making of those decisions, Arizona officials are not free... Under 2B, the person has already stopped for some other reason. He stopped for going 60 in the 20, he stopped for drunk driving. So that decision to stop the individual has nothing to do with immigration law at all. All that has to do with immigration law is whether or not they can ask the federal government to find out if this person is illegal or not, and then leave it up to you. It seems to me that the federal government just doesn't want to know who's here illegally or not. No, I don't think that's right. I think we want to be able to cooperate and focus on our priorities. And one thing that's instructive in that regard, Mr Chief Justice, are the declarations put into the record by the police chiefs from Phoenix and Tucson, both of whom, I think, explain effectively why this Section 2B obligation gets in the way of the mutual effort to focus on the priorities of identifying serious criminals so that they can be removed from the country. Anyway, what's wrong about the states enforcing federal law? There's a federal law against robbing federal banks. Can it be made a state crime to rob those banks? I think it is. I think it could, but I think that... Does the Attorney General come in and say, you know, we may really only want to go after the professional bank robbers. If it's just an amateur bank robber, you know, we're going to let it go. And the state's interfering with our whole scheme here because it's prosecuting all these bank robbers. Well, of course, no one would... Now, would anybody listen to that argument? Of course not. This argument is quite different, Justice Scalia, because here what we are talking about is the federal registration requirement in an area of dominant federal concern, exclusive federal concern with respect to immigration, who can be in the country under what circumstances and what obligations. Are you talking about three now, or is this argument related to two as well? This is an argument about section three. Could I ask you this about two before you move on to that? How is a... This is just a matter of information. How can a state officer who stops somebody or who arrests somebody for a non-immigration offense tell whether that person falls within the federal removal priorities without making an inquiry to the federal government? For example, I understand one of the priorities is people who have previously been removed. Then that might be somebody who you would want to arrest and remove. But how can you determine that without making the inquiry in the first place? Well, in any individual case, that's correct. You would need to make the inquiry in the first place. It won't always be correct if you're arresting somebody based on probable cause that they've committed a serious crime and the inquiry into whether their status will be enough to... What if they stop somebody for a traffic violation, but they want to know whether this is a person who previously was removed and has come back or somebody who's just within the last few hours possibly come... Well, it's just somebody who's previously been removed. How can you know that without making the inquiry? Well, I think it's correct that you can't, but there's a difference, Justice Alito, I think, between the question of any individual circumstance and a mandatory policy backed by this civil fine that you've got to make the inquiry in every case. I mean, I think it's as though, if I could use an analogy, if you ask one of your law clerks to bring you the most important preemption cases from the last 10 years, and they rolled in the last 100 volumes of the U.S. reports and said, well, they're in there, that doesn't make it... What if they just rolled in Whiting? That's a pretty good one. In the federal statute, it says in 1373 that nobody can prohibit or restrict any government entity from making this inquiry of the federal government. And then it says that the federal government has any agency, and then it says the federal government has an obligation to respond. Now, assuming the statute were limited, as I say, so nothing happened to this individual. Nothing happened to the person who was stopped. It wouldn't have happened anyway. All that happens is the person, the policeman, makes a phone call. Now, that's what I'm trying to get at. If that were the situation, and we said it had to be the situation, then what in the federal statute would that conflict with? Where we have two provisions that say, any policeman can call. So, that's where I'm trying to push you. In my mind, I'm not sending your answers to that. And I think the answer is this. 1373 was enacted in 1996, along with 1357. And 1357 is the provision that sets forth the powers and authorities of federal immigration officials. It contains 1357G, which effectively says that the federal government, the Attorney General, can deputize state officials so long as they obtain adequate training and they're subject to the direction and control of the Attorney General in carrying out immigration functions. Then the last provision, G10, says that nothing that we've said so far should be read to preclude informal cooperation, communication or other informal cooperation in the apprehension, detention, removal of unlawfully present persons. But it's the focus on cooperation. And I think you have to, so I don't think you can read into 1373 the conclusion that what Congress was intending to do was to shift from the federal government to the states, the authority to set enforcement priorities. Because I think cooperation in this context is cooperation in the service of the federal enforcement. Can I get to a different question? I think even I or someone else cut you off when you said there were three reasons why 2B. Putting aside your argument that a systematic cooperation is wrong, you can see it's not selling very well. Why don't you try to come up with something else? Because I frankly, as the Chief has said to you, it's not that it's forcing you to change your enforcement priorities. You don't have to take the person into custody. So what's left? So let me just summarize what I think the three are and then maybe I could move on to sections three and five. With respect to two, we think the harassment argument, we think this is a more significant harassment problem than the present impoundment. Please move more forward. With respect to, in addition, we do think that there is a structural accountability problem in that they're enforcing federal law but not answerable to the federal officials. And third, we do think there are practical impediments in that the result of this is to deliver to the federal system a volume of inquiries that makes it harder and not easier to identify who the priority persons are for removal. So those are the three reasons. General, you have been trying valiantly to get us to focus on section three. So maybe we should let you do that now. Thank you, Mr. Chief Justice. I do think the key thing about section three is that section three is purporting to enforce a federal registration requirement. That's a relationship between the alien and the United States government that's exclusively a federal relationship. It's governed by the terms of 1301 and 1306. And the way in which those terms are enforced does have very significant federal interest at its heart. And there is no state police power interest in that federal registration relationship. And I do think, I think it's very important, Justice Alito raised the question of these categories of people. I think it's quite important to get clarity on that. If you are, if you have come into the country unlawfully, but you have a pending application for asylum, a pending application for temporary protected status because you would have to be removed to a country to which you can't be removed because of the conditions in the country. If you have a valid claim for relief under the Violence Against Women Act, based on your treatment, if you have a valid claim for relief because you were a victim of human trafficking, if you have a valid claim for relief because you are the victim of a crime or a witness to a crime, all of those persons are in technical violation of 1306A. And it seems to me that they are in violation of 1306A. So my friend, Mr. Clement, just is not correct in saying that those are people who aren't in violation of 1306A and therefore aren't in violation of Section 3. They are in violation. Maybe 1306A ought to be amended then. I mean, we have statutes out there with a lot of people in violation of it. And then, well, the Attorney General will take care of it. But this is- How we fight our criminals? It's a situation in which no reasonable person would think that the individual ought to be prosecuted. And yet, very often the states aren't even gonna know, in fact, about asylum status. They can't know because there are regulations that require that that to be kept private to avoid retaliation against the person making the application. And so this is, I think, a very strong illustration of why the enforcement discretion for Section 3 needs to be vested exclusively in the federal- Again, I ask you, do you have any other case in which the basis for preemption has been you are interfering with the Attorney General's enforcement discretion? Well, this is- This is an extraordinary basis for saying that the state is preempted. I think what's extraordinary about this actually, Justice Scalia, is the state's decision to enact a statute purporting to criminalize the violation of a federal registration obligation. I think that's the problem here. And they're doing it for a reason- It's not criminalizing anything that isn't criminal under federal law. It's the bank. It's the federal bank example. Well- The state law, which criminalizes the same thing that the federal law does. I think it's quite different. What they're doing here is using 1306A to get at the status of unlawful presence. The only people who can be prosecuted under Section 3 are people who are unlawfully present in the country. That's what the statute says. And they're using it to get at that category of people to essentially use their state criminal law to perform an immigration function. And the immigration function is to try to prosecute these people. And by the way, you can prosecute somebody, they can be put in jail for 30 days here. But under federal law, violation of 1306A is a continuing offense. So the day they get out of jail for that 30 days, they can be arrested again, and this can happen over and over again. And the point of this provision is to drive unlawfully present people out of the state's Arizona. Suppose, and we'll assume these are two hypothetical instances. First, the federal government has said, we simply don't have the money or the resources to enforce our immigration laws the way we wish. We wish we could do so, but we don't have the money or resource. That's the first, just hypothetical. Also hypothetical is that the state of Arizona has a massive emergency with social disruption, economic disruption, residents leaving the state because of flood of immigrants. Let's just assume those two things. Does that give the state of Arizona any powers or authority or legitimate concerns that any other state wouldn't have? Of course they have legitimate concerns in that situation. And can they go to their legislature and say, we're concerned about this, and ask the legislature to enact laws to correct this problem? They certainly can enact laws of general application. They can enforce the laws of general application around the books. They are already, as a result of 8 U.S.C. 1621, it's clear that they are under no obligation to provide any state benefits to the population. But I think most importantly, they can, not most importantly, but as importantly, they can engage in cooperative efforts with the federal government. Excuse me, I see Mike. No, keep going. They can engage in cooperative efforts with the federal government, of which there are many going on in Arizona and around the country in order to address these problems. Didn't you say in your brief, I forget where it was, I thought you said that the Justice Department doesn't get nearly enough money to enforce our immigration laws. Didn't you say that? Of course we have to set priorities. There are only- Exactly, okay. So the state says, well, that may be your priorities, but most of these people that you're not going after, or an inordinate percentage of them, are here in our state. And we don't like it. They're causing all sorts of problems. So we're gonna help you enforce federal law. We're not gonna do anything else. We're just enforcing federal law. Well, what I think they're going to do in Arizona is something quite extraordinary that has significant real and practical foreign relations effects. And that's the problem, and it's the reason why this power needs to be vested exclusively in the federal government. What they're gonna do is engage effectively in mass incarceration, because the obligation under Section 2H, of course, is not merely to enforce Section 2 to the fullest possible extent at the risk of civil fine, but to enforce federal immigration law, which is what they claim they are doing in Section 3 and in Section 5. And so you're gonna have a situation of mass incarceration of people who are unlawfully present. That is going to raise, poses a very serious risk of raising significant foreign relations problems. And these problems are real. There's the problem of reciprocal treatment of- So you're saying the government has a legitimate interest in not enforcing its laws? No, we have a legitimate interest in enforcing the law, of course, but it needs to be, but this court has said over and over again, it's recognized that the balance of interest that has to be achieved in enforcing the immigration laws is exceedingly delicate and complex, and it involves consideration of foreign relations, it involves humanitarian concerns, and it also involves public order and public safety. When, I know your brief you had, you said that there are some illegal aliens who have a right to remain here. And I'm just realizing that I don't really know what happens when the Arizona police call the federal agency. They give the federal agency a name, correct? I assume so, yes. Oh, you don't really have knowledge? Well, I mean, it can come in lots of different ways, but generally they'll get a name and some other identifying information. And what does the computer have? What information does your system have? So the way this works is there's a system for incoming inquiries, and then there's a person at a computer terminal, and that person searches a number of different databases. There are eight or 10 different databases, and that person will check the name against this one, check the name against that one, check the name against the other one to see if they're aliens. Well, how does that database tell you that someone is illegal, as opposed to a citizen? Today, if you use the names Sonia Sotomayor, they'd probably figure out I was a citizen. But let's assume it's John Doe, who lives in Grand Rapids. So then they're illegal. Is there a citizen database? Citizen problem is actually a significant problem. There isn't a citizen database. I'm sorry, there is? There is not. If you have a passport, there's a database of people with passports, so you could be discovered that way. But otherwise, there is no reliable way in the database to verify that you're a citizen, unless you're in the passport database. So you have lots of circumstances in which people who are citizens are gonna come up no match. There's nothing suggested in the databases that they have an immigration problem. If you run out of your house without your driver's license or identification, and you walk into a park that's closed, and you're arrested, they make the call to this agency. You could sit there forever while they figure out if you're. While I'm at it, there is a factual point I think I'd like to correct. Mr. Clement suggested that it takes 10 minutes to process these calls. That's true, but you're in a queue for 60 minutes before it takes the 10 minutes to process the call. So the average time is 70 minutes, not 10 minutes. I have a little, wasn't sure about your answer, Justice Kennedy. Is the reason that the government is not focused on people who are here illegally, as opposed to the other categories you were talking about, because of prioritization or because of lack of resources? You suggested that if every illegal alien that you are, identify is either removed or prosecuted, that that would cause tensions with other governments. So I don't understand if it's because you don't have enough resources or because you don't want to prosecute the people who are simply here illegally as opposed to something else. Well, it's a little more complicated than that. I think the point is this, that with respect to persons who are unlawfully present, there are some who are gonna fall in our priority categories. There are those who've committed serious offenses. There are those who have been removed and have come back and there are other priority categories. Because we have resource constraints and there are only so many beds in the detention centers and only so many immigration judges, we want to focus on those priority categories, find them, remove them. There's a second category, and that is individuals who are here in violation, technically a 1306A, but who have a valid asylum application or application for temporary protective status or other. And with respect to those persons, we think it's affirmatively harmful to think that they ought to be prosecuted. And then there is an additional category of people who are not in the second category and not priorities. And we think there, the idea that an individual state will engage in a process of mass incarceration of that population, which we do think is what Section 2H commits Arizona to do under Section 3, raises a significant foreign relations problem. Why can't we avoid that particular foreign relations problem by simply deporting these people? Free them from the jails and send them back to the countries that are objecting. What's the problem with that? Well, a couple of things. First is, I don't think it's realistic to assume that the aggressive enforcement of Sections 3 and 5 in Arizona is going to lead to a mass migration back to countries of origin. It seems a far more likely outcome is going to be migration to other states. And that's a significant problem. It's part of the reason why this problem needs to be managed on a national basis. Beyond that, I do think it's worth bearing in mind here that the country of Mexico is in a central role in this situation. Between 60 and 70% of the people that we remove every year, we remove to Mexico. And in addition, we have to have the cooperation of Mexico. And I think as the court knows from other cases, the cooperation of the country to which we are removing people who are unlawfully present is vital to be able to make removal work. In addition, we have very significant issues on the border with Mexico. And in fact, they're the very issues that Arizona's complaining about. So we have to enforce our laws in a manner that will please Mexico. No, Your Honor, but it doesn't. No, Your Honor, I'm not saying that. Not like what you were saying. But what I am saying is that this points up why the framers made this power an exclusive national power. It's because the entire country feels the effects of a decision of conduct by an individual state. And that's why the power needs to be exercised at the national level and not the state level. Your concern is the problems that would arise in bilateral relations if you remove all of these people or a significant percentage or a greater percentage than you are now. Nothing in the law requires you to do that. All it does is let you know where an illegal alien has been arrested. And you can decide we are not going to initiate removal proceedings against that individual. It doesn't require you to remove one more person than you would like to remove under your priorities. Right, but the problem I'm focused on, we're focused on, Mr. Chief Justice, is not our removal decisions, but Arizona's decision to incarcerate and the foreign relations problem that that raises. That's why this power's gotta be exercised at the national level. And that arises under three and five. Correct, but not two. Well, two identifies the population that's gonna be prosecuted under three and five. I haven't, I've been up here a long time, I haven't said anything about section five yet. And I don't want to tax the court's patience, but if I could spend a minute on section five. Section five. I do think the fundamental point about section five here is that in 1986, Congress fundamentally changed the landscape. Congress made a decision in 1986 to make the employment of aliens a central concern of national immigration policy. And this court has described the 1986 law as a comprehensive regime. Now, what my friend, Mr. Clement, says is that it may be a comprehensive regime for employers, it's not a comprehensive regime for employees, and therefore there ought not be any inference here that the states are precluded from criminalizing efforts to seek or obtain employment in Arizona. But I really think that's not right. The employment is one problem. And Congress tackled the problem of employment and made a decision, a comprehensive decision about the sanctions it thought were appropriate to govern. And Congress did, as Justice Ginsburg suggested, make judgments with respect to the circumstances under which employees could be held criminally liable as well as the circumstances under which employers could be held liable. And I think it is useful in thinking about the judgments Congress actually- Field preemption, is that your argument with respect to- I think we're making both a field and a conflict preemption argument here, Justice Scalia. And I think it's worth examining the specific judgments Congress made in 1986. On the employer side, and after all, this is a situation in which the concern here is that the employer is in the position of being the exploiter and the alien of being the exploited. On the employer side, Congress said that states may not impose criminal sanctions, and the federal government will not impose criminal sanctions for the hiring of employees unless there's a pattern of practice. It seems quite incongruous to think that Congress having made that judgment and imposed those restrictions on the employer's side would have left states free to impose criminal liability on employees merely for seeking work, for doing what you, I think, would expect most otherwise law-abiding people to do, which is find a job so they could feed their families. So I think that that's a significant problem. In addition, Congress made clear in the law that the I-9 form could not be used for any other purpose than prosecutions for violation of the federal anti-fraud requirements, and if Congress wanted to leave states free to impose criminal sanctions on employees for seeking work, they wouldn't have done that, it seems to me. So I think there are strong indicators in the text that Congress did make a judgment, and the judgment was this far and no farther, and it's reasonable that Congress would have done so for the same kinds of foreign relations concerns that I was discussing with respect to Section 3. It would be an extraordinary thing to put someone in jail merely for seeking work, and yet that's what Arizona proposes to do under Section 5 of its law. Now, of course, there is an express preemption provision, but the express preemption provision, as this Court has said many times, does not operate to the exclusion of implied preemption field or conflict. So we do think those principles apply here. We think there's a reason why the express preemption provision was limited to the employer's side, which is that after the Canis laws had been enacted on the employer's side, and Congress was making clear that those were preempted, there were no laws on the employee's side at the time, and therefore no reason for preemption. Thank you, General. Thank you, Chief Justice. Mr. Clement, five minutes. Thank you, Mr. Chief Justice, and may it please the Court. I'd like to start briefly with the enforcement issues and then talk about the other provisions. The last thing I'll say about the enforcement provisions, since I do think that the government's rather unusual theory that something that's okay when done ad hoc becomes preempted when it's systematic, I think that theory largely refutes itself. But I will say one thing, which is to just echo that there's no interference with enforcement priorities by simply giving the federal government information on which to bring their enforcement priorities to bear. And this is really illustrated by a point this Court made in its Florence decision earlier this month, which is that sometimes you pull somebody over for the most innocuous of infractions, and they turn out to be the most serious of offenders. And so if you preclude officers, as happened in Phoenix, from communicating with the federal government, the federal government will not be able to identify the worst of the worst. And if you want an example of this, look at the declaration of Officer Brett Glidewell at Joint Appendix 183 to 186. He pulled somebody over in a routine traffic stop and was shot by the individual. Now, the individual, it turns out, was wanted for attempted murder in El Salvador and was also guilty of illegal reentry into the United States. He was stopped on three previous occasions, and his status was not verified. Now, if it had been, he certainly would have been apprehended. In at least two of the stops, his immigration status wasn't checked because of a city policy, the city of Phoenix. Now, if the state, I submit, can do anything, it can, at the state level, override those kind of local policies and say that's not what we want. Community policing is all well and good, but we want to maximize communication with the federal authorities. So I think the enforcement policy and priorities argument simply doesn't work. As to Section 3, two points about that. One is, I respectfully disagree with the Solicitor General as to whether the various things that he read off, the litany of situations where somebody is technically doesn't have registration, would be a violation of 1306A. And the reason I take that position is that provision says a willful failure to register. Now, maybe the prosecutors take the view that there's willfulness in those circumstances, but I don't think many judges would. I think they would say that if you've been told by the federal government that you're perfectly fine here and you don't need to register, that that would be good enough to defeat a finding of willfulness. So I don't think 1306A covers- You're inviting the very sort of conflict that he's talking about. Because what's going to happen now is that if there's no statement by the federal agency of legality, the person is arrested. And now we're going to have federal resources spent on trying to figure out whether they have an asylum application, whether they have this, whether they have that, whether they're exempted under this reason, whether the failure to carry was accidental or not. I mean, you are involving the federal government in your prosecution. You may say we're not because all we're going to show is what? That we got a federal call, we got a federal answer that the person wasn't registered? No, we're going to say that we communicated with the federal immigration officials and they told us this is somebody who's perfectly fine and doesn't have to register. No confrontation clause problem with that, with relying on a call to a federal agency and the police officer says, you're arrested, you're charged, it's not an illegal alien or it is an illegal alien. My supposition, Justice Sotomayor, is that they would use that call to not bring the prosecution. So the issue wouldn't even arise. But I do want to be clear about this. How about they get a response? Yes, it's an illegal alien. And they bring a prosecution under section three. So where do they get the records that show that this person's an illegal alien that's not authorized to be here? Who do they get it from? I think they would get it from the federal authorities. I think it would be admitted. There might be a challenge in that case. I mean, you know, this is a facial challenge. I'm not going to try to address that potential Sixth Amendment issue. What I would like to say is two things. One, if there's some sloppiness in the way the federal government keeps its records so that there's lots of people that really should be registered but aren't, I can't imagine that sloppiness has a preemptive effect. The second thing I would say is that I do think in thinking about section three in particular, the analogy is not the fraud on the FDA claim in Buckman. It's really the state tort law that says that it's a violation of state tort law to not even seek the approval that's needed under the FDA for a device. Now, states impose tort law for people that market a device without getting the necessary approval. And nobody thinks that's preemptive because it serves the federal interest. It doesn't have a deluge of information. It forces people to get FDA approval. And in the same way, this state law will force people to register, which is what the federal government's supposed to want in the first place. So there's no preemption there. There's no conflict. As to the employment provision, I do think it's important to recognize that before 1986, the government was not agnostic about unlawful employment by aliens. The employees were already covered, and they were subject to deportation. So the government said, we're going to cover the employers for the first time. I can't imagine why that would have preemptive effect. Thank you, Your Honor. Thank you, Mr. Clement. General Verrilli, well argued on both sides. Thank you. Case is submitted.